UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STACEY SHREVE,

        Plaintiff,                    Case No. 16-12037

v.                                        Paul D. Borman
                                        United States District Judge

CITY OF ROMULUS and ROBERT J.
DICKERSON,                          Elizabeth A. Stafford
                                        United States Magistrate Judge

                    Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Stacey Shreve was roughly two weeks into his probationary period as a newly sworn officer of the Romulus Police Department when he was severely injured in an auto accident. The accident occurred while he was sitting in the passenger seat of a patrol car during a training exercise. The physical effects of the accident on Plaintiff were enduring, and in some respects permanent. He was on disability leave for approximately fifteen months after the accident, returned to work for around six months, went on disability leave again when his injuries turned out to be more severe and persistent than initially diagnosed, and was terminated about a year later.

Plaintiff originally brought this six-count action against Defendant City of Romulus ("**the City**") and Defendant Robert Dickerson (Chief of Police and later

Director of Public Safety for the City), asserting that Defendants committed due process violations, racial discrimination, disability discrimination, and intentional infliction of emotional distress. Plaintiff has since conceded that he cannot maintain any claims against Dickerson, and that he cannot maintain his race discrimination and intentional infliction of emotional distress claims against the City. The Court will dismiss these claims accordingly, leaving Plaintiff's due process and disability discrimination claims in the action.

A hearing on Defendants' Motion for Summary Judgment as it relates to the remaining claims in this action was held on May 4, 2017. For the reasons stated below, the Court will grant Defendants' Motion for Summary Judgment.

## I.  BACKGROUND

### A.  Plaintiff's Employment with the City (July 2012 to December 2012)

Plaintiff began to work for the Romulus Police Department after a chance encounter with Dickerson, then chief of police, in the summer of 2012. Plaintiff had unsuccessfully applied to work for the department earlier that year, and he was working as a service technician for a television installation company when he was assigned to make an installation at Dickerson's home. Dickerson admired Plaintiff's work ethic, and later arranged to sponsor Plaintiff's attendance at the Macomb Police Academy, which Dickerson testified (and Plaintiff was told at the time) was unusual. (ECF No. 26, Defs.' Mot. Ex. B, Deposition of Stacey Shreve at

18:17-21:8; Defs.' Mot. Ex. A, Deposition of Robert J. Dickerson at 6:12-10:8.)

In a letter dated July 27, 2012, Dickerson formally extended Plaintiff a conditional offer of a full-time Police Officer position. The letter stated that before being sworn in as an officer, Plaintiff would have to successfully complete all phases of training at the Macomb Police Academy, which would run from August 13, 2012 to December 12, 2012. (ECF No. 32, Pl.'s Resp. Ex. A, Employment Offer Letter, Pg ID 358.)

Plaintiff attended the academy and graduated without incident. (Shreve Dep. 22:8-15.) Plaintiff then began his Field Training Officer Program ("**FTO**"), a program for newly sworn officers during which each new officer is assigned a full-time training officer, who provides on-the-job training and periodic evaluations of the new hire's progress. (Shreve Dep. 30:12-22.) The length of the FTO period varies from officer to officer, but is typically completed in four to six months. (Dickerson Dep. 13:16-14:21.)

According to the Collective Bargaining Agreement ("**CBA**") in effect at the time, employees who are not certified officers on their date of hire (as was true of Plaintiff) are subject to a fifteen-month probationary period that is separate from the FTO. (Defs.' Mot. Ex. C, Collective Bargaining Agreement at 7, Pg ID 288.) The CBA provides that while the probationary period is in effect, the "employee may be terminated at the sole discretion of the Department with or without cause.

3

This termination will not be subject to the grievance procedure." (*Id.*)

**B.    Plaintiff's Injury and First Disability Leave Period (December 2012 to April 2014)**

During a road patrol with his FTO supervisor on December 29, 2012—roughly two weeks after beginning his FTO—Plaintiff was severely injured in a car accident while he was seated in the passenger seat of a patrol vehicle. In the accident, Plaintiff sustained a dislocated hip, a shattered pelvis, a knee injury, and a spinal disc injury. (Shreve Dep. 23:6-24:14.) He was hospitalized for approximately two weeks following the accident, and received surgery on his hip and on his knee. (Shreve Dep. 25:2-25.)

Plaintiff was on disability leave from when the accident occurred in December 2012 until April of 2014, during which time he received worker's compensation benefits, and during which time the City paid him the difference between those benefits and his salary. (*Id.*; Dickerson Dep. 22:9-16.)

**C.    Plaintiff's Return to Work (April 2014 – October 2014)**

In April of 2014, Plaintiff's doctor cleared him to return to work without restrictions. (Shreve Dep. 40:20-41:1.) Plaintiff resumed his FTO training when he returned to work, but had difficulty passing certain phases of the training. (Shreve Dep. 43:11-17.) John Leacher, the City's Director of Public Safety at the time, testified that when it was brought to his attention that Plaintiff was struggling to

complete the program, he directed his staff to give Plaintiff more time by restarting his FTO period. (Defs.' Mot. Ex. E, Deposition of John Leacher at 11:10-12:17.)

Plaintiff continued to experience pain in his back and leg throughout this period, and was unable to sit for a certain length of time without having to change his position or stretch his leg. (Shreve Dep. 41:2-42:14.) A superior directed Plaintiff to have a medical examination, after which the examining physician determined that Plaintiff's workload should be restricted to 75% of what it otherwise would be. (Shreve Dep. 83:6-17.) It was also determined that Plaintiff should not engage in bending, kneeling, lifting, or squatting. (Shreve Dep. 44:3-10; Dickerson Dep. 30:9-22.)

Plaintiff testified that around this time, he asked Sergeant Sadler, a supervising officer, whether there was any "light-duty" work available for him, and that after the officer put the question to the human resources department, "I was told no, there were no light-duty work for me." (Shreve Dep. 82:14-83:23.) Plaintiff went on disability leave again shortly thereafter, on October 10, 2014. (Shreve Dep. 41:2-6.)

D.    **Plaintiff's Second Disability Leave Period (October 2014 to October 2015)**

Plaintiff was still on disability leave when Dickerson, who by then was chief of staff for the mayor's office, called a meeting on February 26, 2015 at Romulus

City Hall with Plaintiff and Captain Joshua Monte, the officer responsible for the police department's patrol division. (Shreve Dep. 48:9-21, 49:13-21; Defs.' Mot. Ex. D, Deposition of Joshua Monte at 4:20-22.) Two topics relevant to this lawsuit were discussed at that meeting: the status of Plaintiff's certification as a police officer by the Michigan Commission on Law Enforcement Standards ("**MCOLES**"),[1] and the possibility of Plaintiff being reassigned to a dispatcher position.

Dickerson told Plaintiff at the February 2015 meeting that his MCOLES certification had lapsed while he was on disability leave, and handed him a printout reflecting that fact. (Shreve Dep. 50:6-22; Dickerson Dep. 35:13-36:7.) This was later determined to be erroneous, and Plaintiff's certification was reinstated. (Shreve Dep. 50:17-22; Dickerson Dep. 36:13-37:7.)

The February 2015 meeting also involved a conversation about the prospect of Plaintiff working as a dispatcher rather than a police officer. Plaintiff testified that Dickerson broached the subject at the meeting, and told him that "there may be a position opening up in June or July." (Shreve Dep. 51:9-15.) Plaintiff responded

---

[1] The MCOLES is empowered by Michigan statutory law to oversee the licensure of law enforcement officers in the state. The version of the Michigan Commission on Law Enforcement Standards Act that was in effect at the time of these events relevantly defined "certification" as "[a] determination by the commission that a person meets the law enforcement officer minimum standards to be employed as a commission certified law enforcement officer and that the person is authorized under this act to be employed as a law enforcement officer." Mich. Comp. Laws 28.602(b)(i) (2013) (amended 2013) (effective January 3, 2017).

that he "still wanted to be a police officer, that was my main goal, was to try and get better to stay as a police officer."[2] (Shreve Dep. 51:16-20.) Although there was an anticipated vacancy at the time of this meeting, there was not a dispatcher position actually available. (Dickerson Dep. 26:9-27:20.) The City did not offer Plaintiff a dispatcher position when one did open up, according to Dickerson's testimony, because of his statements at the February 2015 meeting. (Dickerson Dep. 27:21-24.) At no point did Plaintiff himself apply for a dispatcher position with the City. (Shreve Dep. 51:21-23.)

## E.    Plaintiff's Termination (October 2015)

Plaintiff was terminated on October 30, 2015, in a meeting with Dickerson, then-police chief Jadie Settles, and union representative Officer Chris Hines. (Shreve Dep. 61:3-18.) Dickerson testified that the decision to terminate Plaintiff was made jointly by Dickerson and Settles, and that the reason for the decision was that Plaintiff was unable to meet the physical requirements of the position.

---

[2] In his deposition, Dickerson gave the following account of the exchange:
He wanted to be a police officer. His goal was to get better. His goal was to keep the rehab and keep working to get his hip and his other injuries In order, and he just was not interested, and I think he even said, "I just -- I'm not the kind of guy that can sit around," because there's a lot of sitting. Then you can stand, too, but it is a very -- It takes a special person to be a dispatcher. You got to work in a small, confined area and a lot of radio activity, and, you know, a lot of down time and up time, and, you know, not everybody can do it. And, you know, like I said, his position was he didn't think that that was a good fit for him.
(Dickerson Dep. 27:5-17.)

(Dickerson Dep. 38:4-15.) Plaintiff himself testified that the reason for his termination was that he was no longer able to perform the essential functions of his job. (Shreve Dep. 47:4-15.) Plaintiff also testified that he had not completed the FTO program as of the date of his discharge. (Shreve Dep. 45:8-25.)

The termination letter that was issued to Plaintiff by the City and signed by Dickerson stated in relevant part:

> [A]fter reviewing recent information from your physician as well as the Independent Medical Examiner (IME) on your physical condition, it appears as though you will be unable to return to work as a police officer without restrictions anytime soon, so granting any further extensions, like we did in the past, is no longer an option.
>
> After reviewing your actual work history, you have physically worked a total of seven months and have been off work on a worker's compensation claim for approximately twenty-four months, which far exceeds the limitations listed within the Collective Bargaining Agreement. Therefore, your employment with the city of Romulus is being terminated effective immediately.

(Pl.'s Resp. Ex. 8, Termination Letter, Pg ID 503.)

## F.    Procedural History

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("**EEOC**") alleging that his termination was wrongful and that the City failed to accommodate his disability. (Shreve Dep. 67:12-68:19.) The EEOC closed its investigation into the matter and issued Plaintiff a right-to-sue letter on or about March 4, 2016. (ECF No. 1, Compl. ¶ 44.)

Plaintiff filed this action on June 4, 2016. (ECF No. 1, Compl.) Plaintiff's Complaint asserted a total of six claims against both the City and Dickerson in his individual and official capacities: deprivation of due process under 42 U.S.C. § 1983 (Count I); race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count II); disability discrimination in violation of the Americans with Disabilities Act ("**ADA**"), 42 U.S.C. § 12102 *et seq.* (Count III); race discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2201 *et seq.* (Count IV); disability discrimination in violation of Michigan's Persons With Disabilities Civil Rights Act ("**PWDCRA**"), Mich. Comp. Laws 37.1201 *et seq.* (Count V); and the tort of intentional infliction of emotional distress ("**IIED**") under Michigan common law (Count VI).

On January 25, 2017, Plaintiff filed a Motion to Compel (ECF No. 20), claiming that the City improperly withheld discoverable documents, including "complete policy and procedures manuals for the City of Romulus and its Police Department." (*See id.* at 6, Pg ID 114.) That Motion was referred to Magistrate Judge Elizabeth A. Stafford (ECF No. 21), but before the scheduled hearing was held, the parties stipulated that "Defendant has now complied with Plaintiff's Discovery Requests," and that the motion was therefore moot. (ECF No. 30.) The Magistrate Judge denied the Motion to Compel on that basis. (ECF No. 31.)

Defendants filed the present Motion for Summary Judgment on February 28, 2017. (ECF No. 26, Defs.' Mot.) Plaintiff responded on March 22, 2017. (ECF No. 32, Pl.'s Resp.) In his Response, Plaintiff conceded that he could not maintain his race discrimination claims asserted in Counts II and IV of the Complaint, his IIED claim asserted in Count VI of the Complaint, or any of the claims in his Complaint to the extent that they are asserted against Dickerson. (Pl.'s Resp. at 2-3.) Defendants filed a timely Reply on April 5, 2017. (ECF No. 34, Defs.' Repl.)

## II.    LEGAL STANDARDS

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (internal citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment."

*Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 324.

"The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which

demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). In other words, he or she "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote omitted).

In determining whether there are genuine issues of material fact for trial, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). At the same time, that party must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, . . . or is not significantly probative, . . . the court may grant judgment." *Anderson*, 477 U.S. at 249–50. Plaintiff cannot meet his or her "burden by relying on mere '[c]onclusory assertions, supported only by [her] own opinions.'" *Green v. Central Ohio Transit Authority*, 647 F. App'x 555, 558 (6th Cir. 2016) (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008)) (alterations in original). Plaintiff "must show sufficient probative

evidence, based 'on more than mere speculation, conjecture, or fantasy,' that would enable a jury to find in her favor." *Green*, 647 F. App'x at 558-59 (quoting *Arendale*, 591 F.3d at 601).

Finally, all evidence submitted in opposition to a motion for summary judgment must ultimately be capable of presentation in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. . . . However, [that party] must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc*., 130 F.3d 1185, 1189 (6th Cir. 1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Ibid*. It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

## III.      DISCUSSION

As noted above, Plaintiff conceded in his Response to the present Motion that he could not maintain his race discrimination or IIED claims as against the City, and that he could not maintain any of his claims as against Dickerson. For this reason, the Court will grant Defendants' Motion for Summary Judgment as to those claims.

Plaintiff's remaining claims are for deprivation of due process pursuant to 42 U.S.C. § 1983 (Count I), disability discrimination under the ADA (Count III), and disability discrimination under the PWDCRA (Count V). As discussed in detail below, Plaintiff has not shown that a reasonable jury could find in his favor on essential elements of each of these claims: specifically, that he had a legally cognizable property interest in his employment with the City, as he must show to maintain his due process claim; and that he was "otherwise qualified" for the position with the benefit of a "reasonable accommodation," as he must show to maintain his disability discrimination claims.

## A.     Procedural Due Process Claim (Count I)

In Count I of the Complaint, Plaintiff alleges that Defendants violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution by terminating his employment without giving him sufficient notice of the grounds of termination, or affording him sufficient opportunity to respond. (Compl. ¶¶ 45-48.)

Such "procedural due process" claims brought under 42 U.S.C. § 1983 require two showings: (1) that the plaintiff "had a protectable property interest in his position," and (2) that the plaintiff was not "afforded the procedures to which government employees with a property interest in their jobs are ordinarily entitled." *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 620 (6th Cir. 2013) (internal

quotation marks omitted).

The first of these two elements is at issue in this case. Regarding that element, the United States Court of Appeals for the Sixth Circuit has explained that

> the existence of a property interest depends largely on state law. Government employment amounts to a protected property interest when the employee is "entitled" to continued employment. Neither mere government employment nor an abstract need or desire for continued employment will give rise to a property interest. Rather, a property interest exists and its boundaries are defined by "rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

*Bailey v. Floyd Cty. Bd. of Educ. By & Through Towler*, 106 F.3d 135, 141 (6th Cir. 1997) (internal citations omitted) (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

"There are two different theories upon which a plaintiff may establish a property interest in continued employment under Michigan law—the 'contract theory' and the 'legitimate-expectations theory.'" *Crawford v. Benzie-Leelanau Dist. Health Dep't Bd. of Health*, 636 F. App'x 261, 267 (6th Cir. 2016).

The contract theory "is grounded solely on contract principles relative to the employment setting," *Mannix v. Cty. of Monroe*, 348 F.3d 526, 532 (6th Cir. 2003) (quoting *Rood v. Gen. Dynamics Corp.*, 444 Mich. 107, 118 (1993)), and it requires proof "of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause." *Rood*, 444 Mich. at 117 (internal

citations omitted). "Such provisions may become part of an employment contract as a result of explicit promises, or promises implied in fact." *Id.* (internal citations and quotation marks omitted).

The "legitimate expectations" theory derives largely from the Michigan Supreme Court decision *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579 (1980)—a case on which Plaintiff relies in his Response. In *Toussaint*, Michigan's high court established that "a provision of an employment contract providing that an employee shall not be discharged except for cause . . . may become part of the contract either by express agreement, oral or written, *or as a result of an employee's legitimate expectations grounded in an employer's policy statements*." *Id.* at 598 (emphasis added).

Michigan courts, as well as the Sixth Circuit interpreting Michigan law, have held that the "legitimate expectations" theory is generally not viable where an employment contract expressly designates the employment relationship as an "at-will" relationship. In *Mannix*, for example, the Sixth Circuit took note that the plaintiff in that case

> cites no precedent, nor have we discovered any, that an expressly at-will employment relationship may be turned into a just-cause relationship by no more than a legitimate expectation on the part of the employee. In all cases where courts have found a *Toussaint* just-cause relationship created by legitimate expectations, the initial employment contract was silent on the question of whether it could be terminated at will. The *Toussaint* court repeatedly recognized that

16

> express at-will contracts would not be affected by its holding. . . .
> Later courts interpreting *Toussaint* reached the same conclusion.

*Mannix*, 348 F.3d at 533 (collecting cases); *see also Bracco v. Michigan Tech. Univ.*, 231 Mich. App. 578, 588 (1998) ("[T]he 'implied contract' theory of *Toussaint* may not be relied upon in Michigan when there is an express contract covering the same subject matter.") (quoting *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 721 (1997)).

Thus when an employment contract unambiguously designates the employment relationship as "at-will," the "legitimate expectations" theory recognized in *Toussaint* will not support a finding of a property interest in continued employment. At the same time, however, Michigan law is clear that when "the employer's policies relating to employee discharge are capable of two reasonable interpretations, the issue is for the jury." *Horton v. 48th Dist. Court*, 446 F. Supp. 2d 756, 762 (E.D. Mich. 2006) (quoting *Rood*, 444 Mich. at 140-41); *see also Murphy v. Birchtree Dental, P.C.*, 964 F. Supp. 245, 248 (E.D. Mich. 1997) (same). The Michigan Supreme Court held in *Rood* that "in all claims brought under the legitimate expectations theory of *Toussaint*, the trial court should examine employer policy statements, concerning employee discharge, if any, to determine, as a threshold matter, whether such policies are reasonably capable of being interpreted as promises of just-cause employment." *Rood*, 444 Mich. at 140. If they are not, the plaintiff has no cognizable property interest in the

position; if they are, the question should go to the trier of fact. The existence of conflicting evidence about this question can be grounds for denial of summary judgment. *See, e.g., Barachkov v. 41B Dist. Court*, 311 F. App'x 863, 872 (6th Cir. 2009) (reversing a grant of summary judgment on a procedural due process claim because there was "a direct conflict in the evidence regarding the exact contours of the termination policy . . . and whether such a policy was ever communicated to, and understood by, all of [the] employees").

Defendants argue that the CBA clearly establishes that at the time Plaintiff was terminated, he was an at-will employee and had no legitimate expectation of just-cause termination. In particular, Defendants point to Section 8.1 and Section 8.2 of the CBA, which provide as follows:

> 8.1: An employee, who is a certified officer at time of hire, is on probation for the first twelve (12) months of employment. *An employee who is not a certified officer at the time of hire is on probation for the first fifteen (15) months of employment.*

> 8.2: *During the employee's probationary period, that employee may be terminated at the sole discretion of the Department with or without cause.* This termination will not be subject to the grievance procedure. Probationary Patrol Officers shall participate in the FTO program and must successfully complete all the elements of the sixteen (16) week program before being confirmed. After completion of the FTO program, probationary officers will be evaluated every month for the balance of the probationary period and upon successful completion of the full twelve (12), or fifteen (15), month period shall be credited with all seniority.

(CBA at 7, Pg ID 288 (emphasis added).) These provisions, Defendants argue, expressly designate the employment relationship between Plaintiff and the City as

"at-will," and therefore foreclose a finding of a cognizable property interest premised on *Toussaint*'s "legitimate expectations" theory.

Plaintiff disputes this reading of the CBA in several respects. First, he argues that neither the provisions quoted above nor any other section of the CBA provides for tolling or extension of the probationary period, and so the plain language of the CBA indicates that the probationary period for an officer who was not certified at the time of hire ends after 15 months, regardless of how much of that time he or she is actually able to spend on the job. Second, Plaintiff maintains, the CBA's requirement that probationary officers "must successfully complete all the elements of the sixteen (16) week [FTO] program before being confirmed," *id.*, does not establish that the probationary period cannot end until the officer completes the FTO program, because "confirmed" should be read to mean "confirmed as having completed the FTO program," and not "confirmed as a non-probationary police officer." Finally, Plaintiff highlights the fact that he continued to receive seniority benefits even while he was away on disability leave.

The Court is not persuaded that the CBA is susceptible to "two reasonable interpretations" as would require submission of this issue to a jury. Plaintiff is correct that the CBA does not expressly state that the 15-month probationary period is tolled whenever the officer is off work on extended disability leave as Plaintiff was. But context makes that much clear, and refutes Plaintiff's

interpretation of the CBA as creating a probationary period that ends after fifteen months irrespective of whether the probationary officer was actually able to work. This interpretation of Section 8.1 is implausible on its face—the basic purpose of a probationary period would be defeated if the probationer were not present to be evaluated—but even if it were not, the language of Section 8.2 clearly contemplates a probationary period that runs during an officer's active, working duty. The officer is to be evaluated on his or her performance every month after completing the FTO program, which would be needless for an officer on extended disability leave, and the words "successful completion of the full . . . fifteen (15) . . . month period" imply active involvement on the officer's part, rather than simply a period of time. A term like "at the end of the fifteen month period" or "after fifteen months have elapsed" would be more consistent with Plaintiff's interpretation of the CBA provision; the more active language of the actual CBA supports Defendants' reading of it.

Section 8.2 also makes clear that completion of the FTO program is a prerequisite to an officer's moving past the "at-will" probationary phase, and the fact that Plaintiff undisputedly did not complete the FTO program is an independent basis for this Court to find that the CBA expressly established an "at-will" employment relationship. In this regard, the Court is unpersuaded by Plaintiff's interpretation of the manner in which the CBA uses the word

"confirmed." Section 8.2 provides that a probationary officer "must successfully complete all the elements of the sixteen (16) week program before being confirmed." But to read "confirmed" as simply meaning "confirmed as having completed the program" rather than "confirmed as a police officer" renders the word irrelevant in context. Plaintiff has not indicated any other component of the CBA that supports this interpretation, and so the Court declines to adopt it rather than the more obvious interpretation of the sentence.

Thus even if Plaintiff's leave period did not toll the probationary period, his failure to complete the FTO program did. Plaintiff highlights the fact that he was credited with seniority while he was on disability leave, and he does so presumably because Section 8.2 of the CBA provides that an officer "shall be credited with all seniority" after the officer completes the probationary period. But the CBA does not indicate that that seniority is *only* to be granted retrospectively after the end of the probationary period. In view of that fact, as well as the clear meaning of the CBA provisions quoted above, the Court does not find that any accrual of seniority by Plaintiff raises a jury question over whether he could have reasonably assumed that he had passed his probationary period by the time he was terminated.

Finally, Plaintiff argues that the terms of his employment may have been governed by more than just the CBA. Attached to Plaintiff's Response are two exhibits that Plaintiff claims imply the existence of other employment-related

policies: excerpts from a Romulus Police Department Policy and Procedure Manual issued in 2011 (Pl.'s Resp. Ex. 11, Romulus Police Department Policy & Procedure Manual), and minutes from a 2016 Romulus City Council meeting which reflect a successful motion to adopt something called the "City of Romulus Employees Policies and Procedures Manual." (Pl.'s Resp. Ex. 12, City Council Meeting Minutes.) Plaintiff contrasts these exhibits with supplemental discovery responses that he received from the City, one of which contained the City's representation that "the only document which governs the terms and conditions of Plaintiff's employment is the Collective Bargaining Agreement." (Pl.'s Resp. Ex. 10, Defendant City of Romulus' Supplemental Answers to Plaintiff's First Interrogatories to Defendant – City of Romulus at 3; Pl.'s Resp. Ex. 9, Defendant City of Romulus' Supplemental Response to Plaintiff's First Demand for Production of Documents to Defendant – City of Romulus.) Plaintiff contends that this representation was an act of bad faith on Defendants' part, and that it creates a genuine issue of material fact as to whether there were other policies governing the terms of Plaintiff's employment that outweighed the presumption of "at-will" employment created by Sections 8.1 and 8.2 of the CBA.

The Court rejects this argument for two reasons. First, as Defendants aptly point out, the two exhibits that Plaintiff claims establish the existence of employment policies other than the CBA are not germane to Plaintiff's period of

employment: the 2011 Romulus Police Department Policy and Procedure Manual predates the time during which Plaintiff worked for the City, and the Romulus City Council meeting minutes are from August 2016, nearly a year after Plaintiff's discharge. Second, to whatever extent these documents could be said to imply the existence of policies that *were* in effect during Plaintiff's term of employment, as well as bad-faith concealment of those policies by Defendants, any argument to this effect is plainly undermined by Plaintiff's representation that Defendants "complied with Plaintiff's Discovery Requests," which Plaintiff made to the Court when he terminated his Motion to Compel by stipulated order. (ECF No. 30.)

The Sixth Circuit made clear in *Mannix* that where an employment contract unambiguously designates the employment relationship it governs as "at-will," the employee has no legally cognizable property interest in continued employment even if he or she independently has a legitimate expectation of a "just-cause" employment relationship. *Mannix*, 348 F.3d at 533. The CBA that governed Plaintiff's employment with the City contained an express "at-will" provision for probationary officers, and the Court finds that Plaintiff was still in this category as of the date of his discharge. Thus, Plaintiff's due process claim could survive summary judgment only if the other policy documents he claims were in effect somehow created a situation allowing for "two reasonable interpretations" of whether he was an at-will employee. *Horton*, 446 F. Supp. at 762. Because

Plaintiff has not given the Court any reason to conclude that additional and conflicting policies governed his employment, and because he waived his argument that Defendants concealed such policies in bad faith when he represented that they fully complied with their discovery obligations, the Court finds that Plaintiff has not identified a genuine issue of material fact as to whether he had a property interest in continued employment with the City at the time he was terminated. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to the due process claim in Count I of his Complaint.

## B.     Disability Discrimination Claims (Counts III and V)

The other two claims that Plaintiff has not conceded are disability discrimination claims—one brought under the ADA, and the other under the PWDCRA. "The PWDCRA 'substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim.'" *Donald v. Sybra, Inc.*, 667 F.3d 757, 763–64 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 598 (6th Cir. 2002)). The parties have neither argued nor provided any reason that the Court should conclude that Plaintiff's ADA and PWDCRA claims should be analyzed under different standards.

The ADA broadly provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee." *Id.* § 12111(2).

The Sixth Circuit recently clarified the required showings for an ADA disability discrimination claim in *Ferrari v. Ford Motor Co.*, 826 F.3d 885 (6th Cir. 2016). In general, "[t]o recover on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability." *Id.* at 891 (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996) and *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317, 321 (6th Cir. 2012) (en banc)). A plaintiff can do this in two ways: "by introducing direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision, or by introducing indirect evidence of discrimination." *Ferrari*, 826 F.3d at 891 (quoting *Monette*, 90 F.3d at 1178).

Different burden-shifting frameworks apply to direct- and indirect-evidence claims. The indirect method adopts the framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

To establish a claim for disability discrimination under the indirect method, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Ferrari*, 826 F.3d at 891–92 (internal citations and quotation marks omitted). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate explanation for the adverse employment decision, whereupon the burden shifts back to the plaintiff to show pretext. *See id.* at 892.

On the other hand, if an employer "acknowledges that it relied upon the plaintiff's handicap in making its employment decision . . . [t]he *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant." *Id.* (quoting *Monette*, 90 F.3d at 1192). In that case, "the plaintiff has direct evidence of discrimination on the basis of his or her disability." *Id.*

The Sixth Circuit elaborated in *Ferrari* that

[i]f there is direct evidence that the plaintiff suffered an adverse employment action because of his or her disability, the plaintiff then "bears the burden of establishing that he or she is 'disabled' " and "'otherwise qualified' for the position despite his or her disability: a) without accommodation from the employer; b) with an alleged 'essential' job requirement eliminated; or c) with a proposed

reasonable accommodation." *Monette*, 90 F.3d at 1186. Once the plaintiff has established these elements, the employer "bear[s] the burden of proving that a challenged job criterion is essential ... or that a proposed accommodation will impose an undue hardship upon the employer." *Id.*

*Ferrari*, 826 F.3d at 891.

There is no dispute that the City terminated Plaintiff because his physical limitations prevented him from carrying out the essential functions of the job of police officer: both Plaintiff and Dickerson testified to that fact. (Shreve Dep. 47:4-15; Dickerson Dep. 38:4-15.) This constitutes "direct evidence" as defined in *Ferrari*,[3] which means that Plaintiff's initial burden is to show that he was disabled and that he was "otherwise qualified" for the position with or without a reasonable accommodation, or with an alleged essential job requirement eliminated.

The parties do not dispute that Plaintiff was disabled under the ADA, and for good reason. The definition of "disability" in the ADA's implementing regulations encompasses any individual with "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual." 29 C.F.R. § 1630.2(g)(1)(i). "Major life activities include, but are not limited to . . . [c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping,

_____

[3] *Ferrari* does demonstrate that in some cases a court should employ both analytical frameworks, but not in a way that is applicable to this case: the plaintiff in *Ferrari* made two distinct claims based on two different disabilities, one of which was based on direct evidence and one of which was not. *See Ferrari*, 826 F.3d at 892. That is not the case here: Plaintiff's ADA claim rests on Defendants' admission of the reason for Plaintiff's discharge.

walking, *standing, sitting, reaching, lifting, bending*, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working . . ." *Id.* § 1630.2(i)(1) (emphasis added).

The question, then, is whether Plaintiff can raise a genuine issue of material fact as to whether he was "otherwise qualified for the position despite [his] disability: a) without accommodation from the employer; b) with an alleged 'essential' job requirement eliminated; or c) with a proposed reasonable accommodation." *Ferrari*, 826 F.3d at 891. Plaintiff does not maintain that he was qualified to work in his original position without accommodation—in fact, he conceded that owing to his disability, he could not perform essential functions of the job. (Shreve Dep. 44:18-22.) Nor does Plaintiff argue that he was qualified for the position with any particular essential requirement eliminated. Instead, Plaintiff contends that the record shows two possible "reasonable accommodations" that the City could have afforded him: a "light-duty" assignment, and reassignment to a dispatcher position.[4]

As to a light-duty assignment, Defendants argue that Plaintiff admitted "in

---

[4] "[A] 'reasonable accommodation' under the ADA may include 'reassignment to a vacant position.' 42 U.S.C. § 12111(9)(B). Consequently, "an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (quoting *Burns v. Coca–Cola Enters., Inc.,* 222 F.3d 247, 257 (6th Cir. 2000)).

his deposition that he *never* submitted a request for any reasonable accommodation." (Defs.' Repl. at 6 (emphasis in original).) This is not entirely accurate. Plaintiff's deposition testimony reflects that shortly before his second disability leave period, he asked Officer Sadler, a supervisor, whether there was any light-duty work available to him, to which Sadler (after speaking with the human resources department) responded that there was not. (Shreve Dep. 82:14-83:23.) Dickerson testified that while light-duty positions were not typically formalized, they were offered "if somebody requested." (Dickerson Dep. 24:14-16.) Dickerson characterized such positions as follows:

> [L]ight duty positions in the police department are police officers that are trained to protect themselves, protect the public, understand the policies and procedures, write police reports if, in fact, the person is on light duty. They have to perform all those tasks. Just because it's light duty doesn't mean you can put anybody in a light duty chair. They have to be able to have passed the training program to be able to interview witnesses, be able to write police reports and things like that . . .

(Dickerson Dep. 24:2-10.)

Defendants go on to argue that Plaintiff would not have been qualified for a light-duty position, in any case, because his MCOLES certification had lapsed,[5]

---

[5] On this point, Dickerson testified as follows:
  If you do not have the training and you haven't passed the Field Training Program as a police officer, you can't work as a police officer. The state MCOLES won't allow you to work as an active police officer and write police reports and do the things that a police officer needs to do.
(Dickerson Dep. 25:15-21.)

and because he had not completed the FTO program. The record does not establish that Plaintiff's MCOLES certification had lapsed, however. In fact, it suggests the opposite: Plaintiff testified that the initial determination that his certification had lapsed was later found to be in error and reinstated. (Shreve Dep. 50:17-51:8.)

For this reason, Defendants have not shown that Plaintiff would necessarily have been precluded by state law from serving in a light-duty position by virtue of a lapsed MCOLES certification. Defendants have, however, established that to work in a "light duty" position, an officer must have successfully completed the FTO program. Dickerson attested to this in his deposition, and he further testified that since Plaintiff "didn't pass the FTO program yet, he was not capable because he hadn't finished his training to even -- to do a light duty job as it relates to a police officer." (Dickerson Dep. 24:2-13.)

It is undisputed that Plaintiff struggled to advance in the FTO program during the six to seven months in which he returned to work between his two leave periods. (Shreve Dep. 45:8-25.) John Leacher, the official who supervised Plaintiff's progress in the FTO program, testified as to Plaintiff's difficulties both with the initial phase of the FTO program and with the remedial training he received related to that phase:

> [H]e was struggling through the program. The protocol when not keeping up with the work that's assigned during a phase of the FTO program is to . . . go back over things that were done already to try to basically get the candidate up to speed. After a certain number of

> hours have been dedicated to that, if the . . . officer is still not able to perform the tasks that they need to, in the phase that they're in, the protocol for our department was to dismiss or terminate employment. That had been the case with Mr. Shreve at that point. The remedial training had not improved his performance and the suggestion was made to terminate his employment.

(Leacher Dep. 11:18-12:5.) Despite this suggestion, Leacher testified that owing to Plaintiff's unique circumstances, he "directed the captain and the officers to start the entire process over again and give him every opportunity we could to be successful." (Leacher Dep. 12:8-10.) Nonetheless, Plaintiff does not dispute that he had not completed the FTO program by the time he was terminated. (Shreve Dep. 71:18-22.) The record thus makes clear that Plaintiff did not satisfy a prerequisite to working in a "light duty" position under the City's standard practices, and importantly, Plaintiff does not argue (nor does the record independently show) that his inability to pass the FTO program despite being given remedial opportunities was owing to his disability. For this reason, the Court finds that Plaintiff has not raised a jury question over whether he was "otherwise qualified" for the position with the reasonable accommodation of a "light duty" arrangement.

The other reasonable accommodation that Plaintiff puts forward as support for his *prima facie* case is the potential dispatcher position that Dickerson raised as a possibility for Plaintiff at the February 2015 meeting. The record reflects that Dickerson mentioned at that meeting that a dispatcher position might open up in the next few months, to which Plaintiff replied that he would rather try to improve

his physical condition and resume his training as a patrol officer. Based on that statement, Dickerson did not inform Plaintiff when a position did open several months later, and Plaintiff never applied for a dispatcher position himself.

Plaintiff argues that the City could not have offered Plaintiff a position that didn't exist at the time, and that the City therefore was remiss in not informing him of the opening later, when it did arise. Defendants counter that Dickerson reasonably relied on Plaintiff's statement that he was not interested in working as a dispatcher, such that the City had no obligation to follow up with him when the position became available, and did not act in bad faith by failing to do so.

Defendants' position has stronger support in the law. The ADA's implementing regulations provide that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). "[T]he interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). The Sixth Circuit comprehensively analyzed the ADA's interactive process in the 2010 case *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195 (6th Cir. 2010), and explained that:

> An employee has the burden of proposing an initial accommodation, and the employer has the burden of showing how the accommodation would cause an undue hardship, but the employer is not required to propose a counter accommodation in order to participate in the

interactive process in good faith. Of course, taking the extra step of proposing counter accommodations may be additional evidence of good faith. If an employer takes that step and offers a reasonable counter accommodation, the employee cannot demand a different accommodation. An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff.

*Id.* at 202-03 (internal citations omitted); *see also Mobley v. Miami Valley Hosp.*, 603 F. App'x 405, 414 (6th Cir. 2015) ("[A defendant] is not required to offer a different accommodation to discharge its duty of good faith. But a counter-proposal might evince the employer's good faith."); *Emch v. Superior Air-Ground Ambulance Serv. of Michigan, Inc.*, No. 11-13275, 2012 WL 4090794, at *16 (E.D. Mich. Sept. 17, 2012) ("[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.") (quoting *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996)), aff'd (Sept. 6, 2013).

Here, the record demonstrates that the City took "the extra step" and proposed its own potential reasonable accommodation. Plaintiff testified that in response to the suggestion at the February 2015 meeting that he work as a dispatcher, he stated that he "still wanted to be a police officer, that was my main goal, was to try and get better to stay as a police officer." (Shreve Dep. 51:16-20.) Plaintiff did not raise the topic again at any point after that. Given that the ADA

places the ultimate burden on the employee to propose an accommodation, and requires only that the employer participate in the interactive process in good faith, the Court finds that Defendants' reliance on Plaintiff's statement to conclude that Plaintiff would not be interested in a dispatcher position when one became available was reasonable, and that Defendants did not therefore act in bad faith.

This is very clearly not a case of an employee responding to an employer's proposed accommodations by "meeting every suggestion with a complaint, and obstinately refusing to take advantage of the accommodations that he deemed unacceptable." *Emch*, 2012 WL 4090794, at *15. The record shows that Plaintiff turned down the proposed dispatcher position because he believed he could overcome his disability enough to work as a police officer. The record also indicates that his superiors understood this. None of the parties appears to have acted in bad faith. But to justify an award of the relief he seeks, Plaintiff must show that he was "otherwise qualified for the position despite [his] disability . . . with a proposed reasonable accommodation." *Ferrari*, 826 F.3d at 891 (internal citations and quotation marks omitted). Because Plaintiff was not "otherwise qualified" for light duty work by virtue of his failure to complete the FTO program, and because Defendants fulfilled their obligations under the ADA by proposing a reasonable accommodation that Plaintiff then turned down, the Court finds that Plaintiff has not met his burden of raising a jury question on the

"otherwise qualified" prong of his *prima facie* case.

Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's ADA and PWDCRA claims in Counts III and V respectively.

## IV.     CONCLUSION

For the reasons stated above, the Court hereby GRANTS Defendants' Motion for Summary Judgment in its entirety.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: June 9, 2017

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 9, 2017.

s/D. Tofil
Deborah Tofil, Case Manager
